v. McGarrigle, et al. Roger Appellant Ron, as the Court is aware, this is a qualified immunity appeal. I wanted to ask at the outset, I want to understand exactly what is before us. I just want to get some clarification. As I understand it, the only issue before us at the present time is qualified immunity of defendant Roger with respect to statements made by Mr. De Ritis to a county solicitor and a council president. Is that correct? I think it's a little broader than that, Your Honor. It also concerns statements. Those were two of the incidents. But it also concerns statements that Mr. De Ritis made to district judges, lawyers, court personnel. That's what I'm a little bit confused about. And while I'm listening to your argument, I'll find a reference in Judge Roof's opinion that the statements made to district judges and friends, et cetera, were not protected conduct. But go ahead with your argument. If the Court please, I'd like to reserve five minutes for rebuttal. Very well. You heard that. Mr. Roof, along those lines, can I also just clarify, regardless of what we decide in terms of qualified immunity dealing with the First Amendment question, the Pennsylvania Whistleblower's Law is not something that we are addressing today and that is slated to proceed toward trial in the district court, correct? That's correct, Your Honor, although if there isn't a First Amendment claim, I don't think there's going to be federal jurisdiction anymore. Well, it would be a matter for the district court in the first instance to exercise her discretion in terms of whether to continue to exercise supplemental jurisdiction. I think that's true, but I don't think the whistleblower claim is really a very valid claim. I know the judge ruled on it, but I think if we get to that point, I think the judge would probably be inclined to just not exercise the jurisdiction over that remaining claim. To Judge Manaske's point, although we're reviewing the summary judgment decision that dealt only with the county solicitor and chair, you concede that this appeal encompasses those statements that were thrown out at the motion to dismiss stage, that is the statements to lawyers and judges, the idle chatter while waiting for the court to begin. Well, I think all of that is part of the big picture in this case, Your Honor. So you say it was properly raised for purposes of appeal and is before us. Mr. Manaske and Mr. McGowen were dismissed early on in the proceedings. I think that's obviously not what we're here to talk about this afternoon, but we're not taking any issue with that dismissal at this time. To clarify, I don't think our questions were going to the dismissal of them as parties, but rather we have before us what could be categorized as four categories of statements, that is statements to lawyers, statements to judges, statements to the county solicitor and to the chair of the county council. So it's your position that all four of those categories are before us? I think so. That's my position. Okay. Thank you. If the court pleases, as I said, this is a qualified immunity appeal, and the basis of our argument is really in two points, as you might expect. Number one, that the speech that we're here to discuss, that said issue, was not constitutionally protected speech. And number two, that even if the court were to rule that it was constitutionally protected, it was not clearly established to the extent that my client, Mr. Roger, would have known that he was violating Mr. Derides' constitutional rights when he terminated him. I'd like to start, if I could, with the second part of that analysis. As the court may be aware, it isn't too often that we get the benefit of a ruling from the Supreme Court on qualified immunity so close to an argument. The court ruled just last week in the case of White v. Pauley on qualified immunity. And I think certainly when you read that opinion, the gist is that, in the view of the Supreme Court anyway, the district courts are not granting qualified immunity defenses really as much as they should be, and they're being much more selective about granting that particular defense. I think if I can quote from the court's ruling, the court said that the clearly established law should not be defined at a high level of generality. It has to be particularized in each case. Otherwise, what the doctrine of qualified immunity really becomes, as the court said, an unqualified liability simply by alleging violation of very general, abstract facts. My view, Your Honors, is that that is exactly what the district court did in this case. If you read the district court's analysis of the qualified immunity issue, it's very general. I think the way the district court put it was that the right at issue was infringes on an employee's constitutional interest in freedom of expression and speech alleging misconduct or wrongdoing by a public official. And from there, the district court went to the conclusion that that was entitled to the highest level of constitutional protection. I think that doesn't really conform with the case law of this circuit on how particularized that analysis has got to be. Counsel, we also can't be tied to a perfect match of the specific facts. We're going to look for the existence of case law that would put a reasonable official on fair notice that his or her conduct was unconstitutional. So let's turn to that case law as regards the elements of whether this is protected speech. I'd like to start with the question of speech as a citizen because you're asserting that Mr. Adrides' statements only occurred while he was acting as an assistant public defender. But, of course, the test that we have under our case law and Supreme Court case law is whether the speech at issue is ordinarily within the scope of the employee's duties. Now, why isn't that when we're talking about idle chatter, when we're talking about communications that are even outside of the commencement of court proceedings, why aren't statements that are being made in that context to lawyers or to judges statements as an ordinary citizen? I think there's a little bit of an overlap between the citizen analysis and the public concern factors that we talk about. But I think the court has to note that all these, and I think one of the rulings referred to I believe it was last year stated this, that the audience is particularly important in terms of looking at these things. And in this situation, Mr. Adrides' audience was composed entirely of people who worked for the court. It wasn't something that he was saying in the course of, say, a letter to the editor in some of these cases. And his complaint, and he testified as well, that all these statements were made when he went out to district courts to appear as a public defender, when he was talking to court employees. So I think one of the other recent rulings that this court made in the case involving the FOP and Camden, FOP versus Camden 842, Fed Third 232, used the language that the speech owed its existence to the performance of those public duties. What do we have in the record that supports the scope of the duties of an assistant public defender? I don't think there is very much on the record about that. We know that Mr. Adrides, at the time that this took place, was handling preliminary hearings for the public defender's office. But other than that, I think that was basically what his duties were limited to. So we're talking here about statements that are made outside of the context of the official hearings, even as to the judges and lawyers, and we'll talk about the county representatives momentarily. So how would you describe the duties of an assistant public defender such that they would encompass what the briefs seem to agree could be deemed idle chatter outside of those official proceedings? Well, I don't believe, Your Honor, you can ever call making the statements that Mr. Adrides was making idle chatter, regardless of where he was making it. But I think Mr. Adrides, in his testimony in this case, acknowledged that he made his statement limited only to people that he thought would be interested in hearing it. And that was composed entirely of district judges, other lawyers, court employees. These are people that he was not meeting on some kind of social basis. These were people that he was meeting because he was performing his duties as a public defender. So I think that that is the reason why I think this has got to be looked at in a more expansive way, if that's the right way of putting it, and that the speech owed its existence to what his duties were as a public official. How would that apply to the statements to Mr. Madren and McGarrigle? I note that my time is up. That's okay. We'll give you the time. I think when you look at the statements to the solicitor and to the chairman of the county board of commissioners, there's no question that I think the cases say that you can't just look at that basically entirely as a statement of public concern. All the cases, I think, imply that there has to be some kind of balancing test between what is a personal grievance and what is a matter of public concern. Let's focus for now on the question of speech as a citizen versus official duties. And do you concede that the statements to Mr. Madren and McGarrigle were outside the scope of an assistant public defender's official duties? Yes. So then we proceed to the public concern element. And before we leave the citizen speech question, if we don't have much in the record, as you said, do we have an open fact question, something that requires a remand and further fact-finding as to the scope of an assistant public defender's official duties to make a determination about the citizenship speech crime? I don't think that's necessary, Your Honor. I have to confess I hadn't thought about that particular possibility before. We are dealing with a record here where I don't think there really were too many disputed facts. I know that normally comes up in a ruling such as this. The key fact that is in dispute is, was he not performing effectively as a public defender or was he fired because he was clogging up the court's docket? And certainly is a key disputed fact as to whether or not his, if he was wrong, whether he was recklessly wrong. Correct? I don't think those are disputed facts either, Your Honor. I think the fact that Mr. DeVritis really made no effort to ascertain whether this rumor that he was spreading around was true. He asked for an investigation. He asked for an investigation from the solicitor and he asked for an investigation from the county commissioners. I think what he asked for, Your Honor, was that the solicitor and the chairman look into the reason why he wasn't being assigned to a trial team. I don't think there was any evidence at all on the record that he asked for an investigation as to whether the president judge and the chief public defender were conspiring to maximize guilty pleas. I don't think there's anything on the record that suggests that. And during the course of this case, I don't think Mr. DeVritis even asked that question of Mr. Roger or of President Judge Kenney. So I don't think there's any evidence of that anywhere in the record. Thank you. On the question of public concern, you were engaged to address that in response to an earlier question about whether the statements to Henry McGarrigle, you seem to be saying that those did not involve a matter of public concern. Can you specifically address those portions of the statements that included the rumor that Kenney wanted Rogers to move him, that he was concerned about the constitutional implications of demoting assistant public defenders who were not pleading on sufficient cases, and that he was concerned about the violations of the rights of his clients? How are those not matters of public concern? I think this is where there has to be some sort of a balancing test. I know this area of the law is full of balancing tests, but in Mr. DeVritis' testimony in his complaint, he made it very plain that the priority that he had when he went in to talk to both of those men was his dissatisfaction with where he was in the public defender's office. He was upset that he had seniority and he was no longer on a trial team. But the Supreme Court and we have been explicit that the fact that speech is motivated because someone is unhappy with other things in the workplace doesn't answer the question about whether what they actually say relates to a matter of public concern. When we have these particular statements being made, do you concede that those statements involve a matter of public concern so that we even reach the third step of the balancing test? I would concede that theoretically they could, yes. But I also think that there are cases, the Miller case among them, that just some sort of brushing up against a matter of public concern is not enough to move something and transform a speech from what is almost certainly, almost primarily a personal grievance into some sort of a constitutional question. And I think that was another thing that came up in that FOP case that this court ruled that private grievances should not be constitutionalized, I think is the expression that was used. I think when I read the district court's decision, it's almost like a say the secret word kind of analysis, that if you just throw something in that has some kind of public concern to it, you're immunized from any sort of employee discipline. Doesn't the district court have support for that approach in Connick v. Myers and in our case law in Monroe and Johnson? We have done some pretty fine parsing where there's been a group of statements, some involving personal grievance and some involving even one, one question on a questionnaire. It can be enough to at least analyze that statement under the third prong, that is to reach the balancing test. Why don't we have that as to at least the statements about concerns, the constitutional implications of demotions or concerns about violating clients' rights? I think the court has just got to look at this, and I don't think the district court did, and look at it and say what is the purpose of this communication? Did Mr. Derides go in to talk to these people because he was motivated from some concern for the rights of indigent defendants, or was he motivated by the fact that he was unhappy with where he was at the public defender's office? And I think any sort of common sense analysis in any of these cases, even though it might not be written that way, there has to be some kind of balancing test where you say, as the court did in Miller, that the primary concern here was a personal grievance, not a public one. Well, the balancing is one that relates to looking at the public concern, but balancing that against disruption in the workplace, right? And the Supreme Court has told us in Waters, in our own Waters case law, we are looking at whether there is a likelihood of disruption, whether in some cases requiring even substantial evidence of a likelihood of disruption. What do we have in the record here that supports a likelihood of disruption? Well, we have Mr. Rogers' affidavit to the effect that as director of the public defender's office, I really could not imagine a more serious allegation that could be made in terms of the functioning of that office, that the public defender's office had a policy of trying to maximize guilty pleas in order to satisfy the president judge's concern about statistics. I think, as this court said in the Monroe case, sometimes the disruption factor is something I think that is self-evident. I think it's self-evident in this case as well. We talked briefly about whether there is evidence that the statements made here were made knowingly or were recklessly false. The district court stated that there was no evidence that what DeMetrius was telling people was knowingly or recklessly false. Is that a finding of fact that we can't review on interlocutory appeal, or are we addressing their legal conclusion that we do have jurisdiction over? I'm sorry, Your Honor. I think that's a legal conclusion. I think the fact that Mr. DeMetrius made no effort in this case to prove whether or not this rumor was true or not is something that's very important. I think the cases of the district court seem to imply that it really doesn't matter whether it was true or not. I think that's a very important consideration here. And that Mr. DeMetrius made no effort to try to determine whether it was true or false. I think it really didn't matter to him whether it was true or false. Thank you. Judge Nygaard, any questions? I have none. Thank you. Thank you very much. Thank you, Your Honor. All right, Mr. DeMetrius, am I pronouncing your name correctly? Yes, Your Honor. Joe DeMetrius, Pro Se. The constitutional analysis, Your Honors, I believe is eminently simple in this case. And I think the way I mapped it out in my brief is the best way to proceed. Does Roger have the right to censor me, to fire me, because I am discussing his operation of the public defender's office? But to reach that question, I do believe that it is necessary for the court to analyze public defender functions, their duties and responsibilities. Do you dispute the statement in Mr. Zarides' affidavit that among the duties of an assistant public defender is to build rapport with the court? No, not at all. Now, these statements were made to judges, to colleagues in the office, to my fellow attorneys in the Delaware County Bar, to friends and relatives in some cases. These were discussions that I was holding for almost a year before I was actually fired. Now, what's been permeating this case is attorney-raised accusation, and you've heard it now several times, that I made no attempt to investigate what was going on. I went to Mike Madrin in January of 2013, five months before the firing. I told him that I heard from the first assistant public defender, Frank Zerilli, who filed an affidavit in this case, and from a colleague of mine named Jake Dolan, a former public defender, that this is what I had heard. That Kenny and Roger had gotten together, Kenny had told Roger he's not moving his cases, which incidentally is a true accusation. I said, I wouldn't be caught dead moving my cases. I believe you have to serve the client. I asked Madrin for an investigation in January of 2013. I didn't hear anything from him. What, if any, significance is there to the fact that it appears undisputed, I think it's even in your own deposition testimony, that for those first six or six to eight months after you had heard about this from Dolan and Zuridas, and you began to make these statements to folks before and after court, during that period you had not conducted any investigation or tried in any way to substantiate whether this fourth person hearsay was in fact true. The answer to that one is very simple, Your Honor. I believed it. I was persuaded that that is exactly what happened. But I didn't see my situation changing. That's why I went to McGarrickle. The demotion occurred in June of 12. I went to McGarrickle six full months later in January of 2013, or excuse me, Madrin, in January of 2013. You mentioned that Mr. Dolan's own statement to you was that this was fourth person hearsay. Yes. And Mr. Zuridas, his own testimony is that he... No, I'm Zuridas. Mr. Dolan, you said that Mr. Dolan's statement was that this was fourth person hearsay as he related it to you. Yes. And as to Mr. Zuridas, he didn't even know where he might have heard this or who it was from. Why, let's assume that you subjectively believed it to be true. Yes. But when you've been told from the outset that this is fourth person hearsay and there's no identifiable source for it, why isn't it at least recklessly false or statements with reckless disregard for the truth to be repeating them over a six-month period to judges and lawyers as if they are true? Because Jake Dolan's statement was only the confirmation. I know it's in my deposition testimony that Frank Zerilli, the first assistant public defender, told me about a week after the demotion when I said to him, Frank, what is going on here? He said, Kenny wants you off the trial team. It was about a week after that at John's Grill in Media on Taco Tuesday that I heard from Jake. He said, yeah, Jake fleshed it out. Yeah, that's what happened was Kenny had gone to Roger and said, Joe's not moving his cases. And that was the confirmation. The original guy was the first assistant public defender, someone who meets with Roger, who deals with Roger on a daily basis. I'd like to clarify what is still before us. I had asked questions of Mr. Rafe on this point. I was referring to page six of the district court's opinion on the summary judgment motion and footnote 30 of that opinion. In the text, Judge Roof writes that defendant Roger has not set forth evidence that the speech at issue, and then she says, plaintiff's statements to Mr. Madren and Mr. McGarrigle occurred in the workplace, nor has defendant Roger demonstrated that it was part of plaintiff's official duties to raise such concerns with county officials. And then in footnote 30, she writes, defendant only argues that plaintiff's complaints to friends, colleagues, magisterial district judges and private attorneys occurred at work, and the court has already held that plaintiff failed to state a claim for relief for First Amendment retaliation for these complaints, citing the decision on the motion to dismiss at page eight. Can you help me understand what's before us now in light of that footnote? As I started to say earlier, a few moments ago, before we digressed, in order for the court to analyze this case properly, it has to consider public defender functions. Now, the public defender in Delaware County, and this is now the second time I've been fired. That's in the record somewhere. I believe that the client is entitled to the best possible, the strongest intensity of legal intellection. I think I said in my brief, he's entitled to the same quality of service as a guy at a five-star law firm would give on the 55th floor of a midtown skyscraper. And the pattern that has developed in both of the public defender offices that I have worked in, and this is really the big issue for the court, is the idea that we file cases through the public defender's office. In terms of the plea factory, if you read Zerilli's affidavit and Rogers' affidavit, you will look closely at some of the complaints they're making about my performance. Joe gets hung up on discovery. Joe gets hung up on laboratory reports. This is something that I believe that the public has the right to know. A chief public defender who's willing to manipulate his trial teams to keep the defendant from getting vital information about his case, when he thinks that all the defendant needs to do is get well, and you'll see that language in there, your honors. Mr. Gerez, I think we understand your arguments as to the public interest and public concern about this issue that you're raising. Yes, Your Honor. But I think Judge Varnasky's question, and I share it, is as we are asked today to address the specific question of whether the statements that you made are protected speech, it would be helpful to clarify which statements are at issue. Do you, despite the fact that we're reviewing the summary judgment decision that seems on its face to deal only with the questions of the statements to Madrin and McGarrigle, is it your position that we're nonetheless also addressing the statements that you made to judges and to attorneys? Absolutely, Your Honor. That were handled at the motion to dismiss stage? I don't see how you can divorce one from the other. I went to McGarrigle and Madrin to ask Madrin for an investigation, and the man incidentally promised me his cooperation. That was the last I heard from him. We're not questioning you about the statements to Madrigal or McGonigal. We're questioning whether the statements made in conversations with magisterial district judges, friends, fellow attorneys in your office, ADAs, are those statements protected? Absolutely. Or were they ruled out by the district court on the motion to dismiss? I don't believe they were. Those statements are statements of public concern. And I believe that I said in my brief the way to approach the analysis is instead of the personal angst issue that was vouchsafed by the Miller case, the proper analysis would the public want to know, would my fellow attorneys want to know that I'm pressured when I have a co-defending case with them, I'm being pressured to plead the guy out. How can a fellow attorney take a case in trial if he thinks that my guy is being pressured to plead the case out and possibly testify against his guy? Again, that goes to public concern, but the first question we need to address is whether the particular statements at issue were in your capacity as a private citizen or in the course of official duties. And in Garcetti and Gorham, we are instructed that the question, the inquiry into official duties is a practical one. We aren't looking at just the formalities. How could it be that when an assistant public defender is going to court for purposes of a hearing, the statements that are made, even in idle chatter, immediately preceding or in the aftermath of that proceeding in the courtroom, are not part of official duties as de facto official responsibilities? My question, my answer to that would be what would it matter if they were? What would it matter if I said on the record in a case, you know, I've got to plead this guy out or I'm going to lose my job? Because Supreme Court precedent and our precedent is quite clear that if a statement is made in the context of your official responsibilities, it is not protected speech. But does it disrupt the office? Wasn't Garcetti about disrupting the office? That's the third prong. We never reach that if we have speech that is not in the capacity of the citizen and if it doesn't involve a matter of public concern. So we need to address those threshold questions before we even get to balancing, don't we? But if I'm not appearing as a public defender in those hearings, if I'm simply on the premises waiting for a case to begin, none of these discussions were held with judges or fellow attorneys or colleagues in the office on the record at all. As I said, this was idle chatter. This was chatter before and after the beginning of court cases. Undoubtedly, I was being paid by the office, that's fine. Supposing I had run into one of these guys in a restaurant someplace. We're talking about statements, correct me if I'm wrong, but as I understand the records here, we're talking about statements that are made during the workday in court when you have proceeded to the courthouse for purposes of making an appearance in a hearing. Yes, but they were not made as part of an ongoing case. They were made in conversations that I could just as easily have had at the Christmas party or on a street corner or on a bus. But if building rapport and credibility of an office, whether a prosecutor or defendant's office, is part of the official responsibilities of an assistant of that office, then why isn't the manner in which you're conducting yourself, speech that you make, in the courthouse before and after a proceeding in which you are acting in your official capacity, why aren't those part and parcel of the official responsibilities of serving as an assistant? Maybe they are. Maybe the public should be warned about that. Maybe a public defender needs to bring these issues to the attention of the judges that he's serving in front of. Maybe a statement should be given to the Delaware County Bar. Maybe I should have drafted something for the Board of Judges of Delaware County and said, I need to warn you that I'm getting pressure. I am being taken off the trial team and I'm not the only one. In Judge Roof's court, if this case goes to trial, I could produce other public defenders who have been pressured, whose jobs are being manipulated. So the question that I would have for you is, isn't that part and parcel of the public's need to know what is going on with a law firm that is funded by the public? That's what a public defender's office is. Theoretically, it is an ordinary law firm owned by the taxpayers. And the operations of that office need to be discussed in public. You seem to be arguing now that this is a fact. That there was, in fact, collusion between judges and Mr. Roger. That there is, in fact, a policy. But in your brief, you take the position that the question before us is whether fourth person hearsay, whether it's idle chatter or bar talk, whether rumor alone qualifies for protection. My understanding of New York Times versus Sullivan, Your Honor, is that caustic, insolent, even openly insulting, which is not what I was, even openly insulting language, is protected. When you're discussing it within the context of a public organization, a public agency, and the behavior of public officials. I believe the statement that was made to me, simply because it was two of my buddies who had told me that. Do you agree on what you know now in this record, or what this record now reflects, that the question before us is whether statements, including unsubstantiated rumor, qualify for protection under the First Amendment? Well, I believe, yes, I believe that unsubstantiated rumor does qualify for public protection. First Amendment protection. As long as it occurs within a context of responsible efforts to investigate. It is a valid strike to say, you were taken off that trial team in June of 12. You didn't go to Madrin until January of 13. Your Honor's point is a good one. When I went to Madrin, Madrin said, don't worry, I'll take care of it. Now, when I went to McGammerchill, I didn't quite ask for an investigation. I asked to address, and that's in my filing somewhere. I said to McGammerchill, who was the chairman of county council, I would like to address county council on this. I would like to sit down and discuss what's going on in the PD's office. The failure of both of these men to get back to me, I took as substantiation. Which I think is a normal thing for anyone to do. We're trained lawyers, we evaluate the law of evidence. On that time, Your Honor's... Hold on, see if there's any other questions. Mr. Krauss? Mr. DeRose, you say you believe this rumor because two of your buddies told you. Did it ever occur to you that maybe the most direct way of finding out whether this is rumor or truth would be to go and talk to the judge? Go and talk to your boss? Go and talk to Waylon? I see nothing in the record that you did anything like that, except to just continue with this nonsense. That's a valid question, Your Honor. The answer I can give you on Roger and Kenny, and this has to be phrased very carefully, Doug Roger is, and I did say this in my deposition, Doug Roger, to me, does not handle confrontation well. As evidenced by my firing. I did think, and I think it's a much more pertinent question to say, well, why didn't you go to Judge Kenny about this? The answer is, I did not want to legitimate what he had done. I didn't want Kenny to think that he had any right to manipulate the personnel in the public defender's office. That's why I wanted an official investigation, because that can be kept quiet. If they were checking with this on their own, they don't have to sit, this doesn't have to go to the press, it doesn't have to go to anybody else. Speaking only for myself on that, I can say that as a former common pleas judge, I would be very concerned if people were spreading rumors like that, and I would have welcomed you to come in and say, Judge, are you aware of what's going on? I did think about that, Your Honor. As I said, I thought very strongly about going to Judge, I never thought about going to Doug Roger, because as I said, there are certain problems in my interaction with Roger, and I think other PDs will back me up at trial on that one. I did think about going to Judge Kenny, but I thought that it would have been a mistake, because I believed, as I said, that I don't want this meeting to get into a discussion. It's not his job to run the public defender's office, to make personnel decisions like that. Okay, I have no other questions. What about making inquiries with Mr. Zaredes, or even your fellow assistants, to ascertain whether there was indeed an office-wide policy of forcing pleas or demoting assistants who were pleading cases out before reporting that as fact? Well, Zarede and I were discussing this on a weekly basis, which is strange, because Roger is saying that he didn't know anything about this until the week of the fire on April 29th. Did you ask Mr. Zaredes to investigate? No, I did not, no. Frank is the first assistant public defender, but he and I would discuss the matter. I had the impression from Frank that it was pretty much locked in, and I wasn't going back up to that trial team until I made an assurance to somebody, either Frank or Doug, that I wasn't going to demand discovery anymore, I wasn't going to insist on getting laboratory reports in cases. Frank was telling me on a daily basis, we've got to stop doing that. And the problem there is that when you do that, you turn the public defender into a therapist. You make the public defender just a mouthpiece for the prosecution. That's awesome. That's a cataclysmic thing. Mr. Zaredes, if we do reach the third prong, that is balancing with office disruption, you stated in your brief in response to the assailant in an appellant's brief that your statements were highly injurious to the office. You respond that that may be so. Is it your position that the statements you made, you recognize, could cause high disruption to the functioning of the office? Your Honor, I was making these discussions for over a year, and I did not see any disruption to the office. The other side of that issue is, how can the office be disrupted? Because the chief public defender gets investigated, possibly gets disciplined, and hands down a policy that says, I am backing you up from now on. Everybody in this office can seek whatever discovery they want. You can get witness statements, laboratory reports, you can take continuances, you're allowed to fight your trials, and you're not going to be interfered with by anyone when you do that. The citizens of Delaware County are going to make out like little buddies on that one. That works out beautifully. That's not an injury to the office, Your Honor. That's an enhancement to the office. The office can only benefit by having a chief public defender who backs up his people. We discussed in Sprague v. Fitzpatrick the relationship of there was first assistant and DA. We talked about how where there needs to be a close working relationship for which personal loyalty and confidence are necessary, but to have in that context the subordinate making public criticism of the DA, his supervisor, was on its face something highly disruptive. Why doesn't Sprague pertain equally here? Well, Your Honor, I would suggest that you take a look at Roger's affidavit because he and Zarulli are claiming in their affidavits that I was absolutely woefully incompetent as a public defender, never investigating his cases, never subpoenaing witnesses for trial. They were holding discussions behind my back, and this, again, is one of the reasons why I deliberately did not want an internal investigation because I knew what was being said behind my back. I think I put it in my deposition. I think that when Attorney Wraith questioned me on my deposition, which is now over a year ago, I remember saying, because he asked the same question, I said as soon as Roger said what he said, I'm sending you over to juvenile because you're an expert in juvenile law and I need you over there, I knew that there was something going on. I was well aware that things were being said behind my back. I wanted to contain the situation because I was extremely worried that lies were being told behind my back, and, of course, if you read the affidavits, you'll see that those lies have spilled over now into an official record before Judge Roof. Thank you very much. Thank you, Your Honors. Mr. Wraith, rebuttal? Thank you, Your Honor. I don't know if I'll need to complete five minutes, but I just had a few points I wanted to make. First of all, in response to Judge Nygaard's question about why, when he asked Mr. DeRegis why he hadn't asked Judge Kenney about this, I just wanted to point out he really didn't ask Judge Kenney about this even when he took Judge Kenney's deposition in this case. He asked him no questions really that had to do with the specific allegations he's making. When we had the opportunity to have Judge Kenney, a president judge of the court, appear for a deposition, which doesn't happen every day, the deposition lasted, I think, about 12 minutes, and at no point did he ask Judge Kenney anything about this conspiracy to maximize guilty pleas. So I just thought that was something that's on the record that should be pointed out. The other thing I wanted to mention in terms of what Mr. DeRegis was saying about being pressured to not take cases to trial is his testimony, and he admitted it, I believe, in the undisputed facts as well, that he took no more cases to trial than any other public defender in the Delaware County Public Defender's Office. Even false statements may be entitled to protection. I think it's possible, yes. The Supreme Court has told us so, so I hope you would agree. Well, I'm going to agree with the Supreme Court on that one as well, but I think, once again, I think it has to be something that a court takes into consideration, the truth or falsity of what the allegation is. And I think the fact that Mr. DeRegis really made no bona fide effort to check this out, other than talking to his buddies at Taco Tuesday, really doesn't make this a very good faith effort on his part. But if I can conclude kind of where I started off this thing, I think that the one point I wanted to stress was I think the way the district court phrased the question here in terms of qualified immunity was much too broad. And I think Judge Krauss indicated this a few minutes ago, that the question I think that should be posed is, does a public employee have a right under the First Amendment to spread rumors about their superior, particularly when they've made no effort to ascertain whether those rumors are true or have any kind of first-hand knowledge about whether those rumors were true. And I agree that we can't get overly particular in terms of phrasing these things, but I think there's no question I think when you look at the opinion as it came down from the district court that the question as it was phrased was too broad. And I think that was the major point that the Supreme Court wanted to make last week in the White case. And finally, I think the question that has to be considered, and we've been talking about this for a while now, was the state of the law as far as this went so clearly established that Doug Rodger, when he was sitting there on the morning list of what finally happened, would have known that what he was doing was violating Mr. DeVita's constitutional rights. And our opinion is that there's no way that he could have known that at that time. Thank you. Thank you. One last question for you. The district court had distinguished Sprague versus Fitzpatrick, stating that there was no evidence that the plaintiff's relationship with Rodgers was comparable to the close working relationship between a DA and first assistant. Do you agree that Sprague is properly limited to the kind of relationship between the head of an office like a DA or public defender and first assistant? Or can you speak to the nature of the relationship between the head of that type of office and even a line assistant with regard to what relevance Sprague may have for us? I think it's relevant, but I think the public defender's office in Delaware County is a pretty big office. But nevertheless, I think Doug Rodger has a fairly personal relationship with most of his public defenders in some sense or another. There are things on the record here how it was an example of when Mr. DeVita had failed to show up for court. Doug Rodger personally drove out to Mr. DeVita's house to make sure that he wasn't ill or incapacitated in some way. So I'm not saying that just as a matter of course you would have to have that kind of close working relationship here. But I think, and this is on the record, that both Mr. Rodger and Mr. Zarilli, and Mr. Zarilli is a close personal friend of Mr. DeVita's, worked very closely with him to try to improve his performance. And I don't think there would be any question that as a result of the allegations that he was making, these rumors and what he said in this case, that there's a real disruption in that relationship that would have affected the workings of the public defender's office. Thank you very much. Thank you, Your Honor. Judge Nygaard, we'll call you in about five minutes. Is that all right? Thank you. Court is now adjourned.